# DISTRICT COURT OF THE VIRGIN ISLANDS
# DIVISION OF ST. CROIX

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | Criminal Action No. 2017-0017 |
| **ROY CHRISTIAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**Attorneys:**
**Emily J. Wasserman, Esq.**
St. Croix, U.S.V.I.
    *For the United States*

**Omodare B. Jupiter, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant*

## MEMORANDUM OPINION

THIS MATTER comes before the Court on Defendant Roy Christian's ("Defendant") "Motion to Suppress Physical Evidence and Statements," filed on May 8, 2017 (Dkt. No. 11), and the Government's "Opposition to Christian's Motion to Suppress Physical Evidence and Statements," filed on May 22, 2017. (Dkt. No. 14). An evidentiary hearing was held in this matter on December 12, 2017. For the following reasons, the Court will deny Defendant's Motion.

### I.    PROCEDURAL HISTORY AND BACKGROUND

On April 12, 2017, the Government filed an Information charging Defendant with one count of Manufacture of Marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). (Dkt. No. 8).[1] On May 8, 2017, Defendant filed the instant Motion seeking to suppress all physical evidence that resulted from the alleged unconstitutional search executed on his property as "fruit

---

[1] Prior to the Information, the Government commenced this action by filing a Criminal Complaint on March 30, 2017. (Dkt. No. 1).

of the poisonous tree." (Dkt. No. 11).[2] The Government filed its Response on May 22, 2017, urging the denial of Defendant's motion on the grounds that none of the physical evidence was obtained in violation of Defendant's constitutional rights. (Dkt. No. 14).

At the suppression hearing, the Government offered the testimony of Moses President, Task Force Officer (TFO) with the Drug Enforcement Administration ("DEA"), and DEA Special Agent Jeremy Latchman, and also introduced several exhibits. In addition to the Defendant himself, Allison Horn, an investigator with the Federal Public Defender's Office, testified on behalf of the Defendant. The following facts emerged from the record established at the suppression hearing.[3]

TFO President testified that, on March 15, 2017, he received information from a Confidential Source regarding illegal marijuana cultivation at Defendant's residence located in Fredriksted, St. Croix. The Confidential Source also reported that Defendant moved marijuana plants around the property.

TFO President testified that, the next day, March 16, 2017, he drove to Defendant's property to corroborate the tip from his Confidential Source. To reach the property, TFO President

---

[2] In his Motion to Suppress, Defendant also asserted that his *Miranda* rights were violated because he was in custody at the time he was questioned about the marijuana cultivation. *Id*. at 7-9. Further, Defendant argued that, to the extent the Government alleges that he waived his *Miranda* rights, the waiver was not voluntary. *Id*. at 10. Accordingly, Defendant sought to prohibit introduction of all statements made in response to the questions of the authorities because he was not *Mirandized*. *Id*. at 7-10. He also sought to suppress those statements as "fruits of the poisonous tree" resulting from an unlawful arrest and detention. *Id*. at 11. The Government argued to the contrary. Because Defendant withdrew these arguments at the suppression hearing, they are not addressed in this Opinion.

[3] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

described driving off the main road onto a dirt road, which led to a clearing about a mile away where at least three different properties were located. There was at least one property on the right and at least two to three properties to the left of the clearing. According to TFO President, the dirt road could be used by anyone trying to reach any of these properties, and that to exit the clearing, one would have to turn around and go back on the same dirt road. TFO President also testified that there were no gates or fences to demarcate where Defendant's property began or ended from that of the other properties. Moreover, TFO President described Defendant's property as comprised of at least four different structures.

Upon his arrival, TFO President confirmed the location of Defendant's property to the right of the clearing, and testified that, from his vantage point on the dirt road, he saw what he believed to be several marijuana plants growing in pots positioned in the lower northeastern corner of Defendant's property. TFO President testified that, when making this observation, he did not get out of his car nor did he drive up to Defendant's property. After observing the marijuana plants, TFO President said he turned around and drove away.

In order to gather more descriptive details of the various structures on Defendant's property for a warrant application, TFO President testified that he returned to Defendant's property on March 27, 2017, via the same dirt road and took photographs of the various structures on the property. TFO President further testified that he maintained approximately the same vantage point that he had on the dirt road on his prior visit and observed that the marijuana plants remained on the lower northeastern corner of Defendant's property. TFO President reiterated that he did not get out of his vehicle or drive any closer to Defendant's property than on the first visit. TFO President also testified that on March 29, 2017, he arranged for a flyover of Defendant's property to take

3

aerial photos, so as to determine how to position police officers during the execution of the search warrant. A warrant was obtained on the morning of March 30, 2017.

Later on March 30, before executing the warrant, TFO President and Special Agent Latchman testified that they drove to Defendant's job site. The officers further testified that they informed the Defendant of the search warrant for his property and asked him if he was willing to cooperate and accompany them to the property while they conducted the search. According to TFO President and Agent Latchman, the Defendant agreed and accompanied the officers in their vehicle. The Defendant rode in the front passenger seat, while TFO President drove and Agent Latchman sat in the back seat. During the drive, the officers testified that they neither spoke with Defendant nor asked him any questions.

Agent Latchman testified that, when they arrived at Defendant's property, the Defendant stood by the car with him while the police executed the search. According to TFO President, while the search was executed, the only question asked of Defendant was who else resided on the property. TFO President testified that, during the search, he discovered a larger growth of marijuana plants in the southeastern side of Defendant's property. He also testified that he found more marijuana plants in wooden boxes in different areas of the property.

Following the discovery of the marijuana plants, TFO President and Latchman testified that Defendant was arrested and read his *Miranda* rights. TFO President testified that Defendant was also provided with an Advice of Rights and Waiver of Rights form and a Recording Declination form which stated that he was willing to make a statement and answer questions only if no audio or video recording was made. The Defendant signed both forms and these documents were admitted into evidence.

Defendant offered the testimony of Investigator Allison Horn, who stated that she visited Defendant's property on at least two occasions on December 6 and 10, 2017, to make observations and take photographs from different vantage points. Investigator Horn testified that when she viewed Defendant's property from the same vantage point as TFO President, she was not able to see the eastern side of the property where TFO President testified he had observed the marijuana plants.

Defendant also testified on his behalf. He reported living on the property for approximately 51 years and admitted growing marijuana there. Defendant testified that anyone observing the property from the dirt road where TFO President stated he was located would have been able to view marijuana plants placed on the lower northeastern corner. Defendant further stated that it was for that very reason that he never planted any marijuana plants on the northeastern side. Instead, the Defendant testified that he grew marijuana on the southeastern side of his property to conceal them from public view. Defendant further testified that he used seedling boxes to grow his marijuana plants, and that he would transfer these seedling boxes from another part of his property to the southeastern side where he grew the marijuana plants.

## II.   APPLICABLE LEGAL STANDARDS

The Fourth Amendment protects individuals, *inter alia*, from "unreasonable searches" in their homes. U.S. Const. amend. IV. A search occurs when the government (1) physically intrudes on constitutionally protected areas or (2) invades an expectation of privacy that society recognizes as a reasonable expectation. *See Florida v. Jardines*, 569 U.S. 1, 6-7 (2013); *Kyllo v. United States*, 533 U.S. 27, 33 (2001). "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation omitted). Courts "regard the area 'immediately surrounding

and associated with the home'—what our cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes.'" *Jardines*, 569 U.S at 6 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)); *accord Estate of Smith v. Marasco,* 318 F.3d 497, 518 (3d Cir. 2003) ("Fourth Amendment protections extend not only to a person's home, but also to the curtilage surrounding the property"). To fall under the Fourth Amendment's protection, the area at issue must "harbor[] the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn*, 480 U.S. 294, 307 (1987) (internal citation and quotation marks omitted).

The fact that an area is deemed within the curtilage does not provide blanket protection. *California v. Ciraolo*, 476 U.S. 207, 213 (1986). "The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *Id*.

The law, moreover, distinguishes areas deemed as curtilage from "open fields." *Oliver v. United States*, 466 U.S. 170, 180 (1984). Under the "open fields" doctrine, any property beyond the curtilage is not afforded Fourth Amendment protection. *Id.* "Open fields" may consist of "unoccupied or underdeveloped area[s] outside of the curtilage. *Dunn*, 480 U.S. at 304. "[O]pen fields do not provide the setting for those intimate activities that the [Fourth] Amendment [] intended to shelter from government interference or surveillance . . . [A]s a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be." *Oliver*, 466 U.S. at 179. Thus, "a trespass on open fields, as opposed to the 'curtilage' of a home, does not fall within the scope of the Fourth Amendment because private property outside the curtilage is not part of a 'hous[e]' within the meaning of

the Fourth Amendment." *United States v. Jones*, 565 U.S. 400, 420–21 (2012). *See also Dunn*, 480 U.S. at 304-5 (finding no unconstitutional trespass when officers stood on Defendant's open fields, outside the curtilage of the house, and peered into the open front of Defendant's barn).

## III. DISCUSSION

As discussed below, there was no illegal entry onto Defendant's property so as to warrant the suppression of the evidence at issue. Accordingly, the Motion to Suppress will be denied.

### A. Suppression of Physical Evidence

Defendant claims that TFO President may have entered upon a constitutionally protected area—his curtilage—when he made his observations without a warrant on March 16, 2017. (Dkt. No. 11 at 3-5). Accordingly, Defendant argues that, because the basis for probable cause in the application for the search warrant included the officer's illegal entry onto his property, all physical evidence resulting from the subsequent search should be suppressed. *Id*. at 5-7, 11.

In contrast, the Government argues that all evidence which served as the basis for probable cause supporting the search warrant was legally obtained. (Dkt. No. 14 at 5). The Government contends that during both his March 16 and March 27 visits, TFO President did not illegally enter Defendant's property, but instead lawfully observed what was publicly visible from a public road. (Dkt. No. 14 at 1-4). Alternatively, the Government argues that, even if the officer accidentally trespassed onto Defendant's property, such a trespass was committed on Defendant's "open fields," which is outside the purview of Fourth Amendment protection. Thus, the Government maintains that no constitutional violation occurred that would warrant suppression of the evidence.

The analysis of the issue here—whether a law enforcement officer illegally entered Defendant's property in violation of his Fourth Amendment rights—depends on which version of events the Court credits, as the account by TFO President conflicts with Defendant's testimony on

7

certain significant points. TFO President claims that he observed marijuana plants located in the lower northeastern side of Defendant's property from his vantage point on the dirt road, while Defendant argues that, while he grew marijuana plants on his property, he never planted them on the northeastern side of the property, and thus TFO President could not have observed the marijuana plants growing in that location. Defendant also argues that, even if TFO President observed plants in that location, he could not have confirmed that they were marijuana plants without coming closer, thus concluding that TFO President illegally entered his property.

In view of the conflicting testimony, the Court is required to make credibility determinations. *See United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) ("[A]t a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge") (internal citations and quotation marks omitted). "The Court judges credibility by considering a number of factors, including the witness's demeanor and manner on the stand, his ability to accurately recollect the matters at hand, the manner in which he may be affected by the outcome, the extent to which his testimony is either supported or contradicted by other evidence and testimony in the case, and whether it withstands the 'common sense test.'" *United States v. Davis*, 2014 WL 1394304, at *3 (W.D. Pa. Apr. 9, 2014) (citing *United States v. Murphy*, 402 F.Supp.2d 561, 569 (W.D. Pa. 2005)); *United States v. Demings*, 787 F. Supp. 2d 320, 326 (D.N.J. 2011) (citing same). "[A] witness should not be considered any more or less credible because the witness is a law enforcement officer." *United States v. Graham*, 2014 WL 3396495, at *4 (D.N.J. July 9, 2014) (citing *United States. v. Bethancourt*, 65 F.3d 1074, 1080 (3d Cir.1995)).

Here, the Court credits TFO President's testimony concerning the observations he made of

the marijuana plants on both March 16 and March 27. First, based on the Court's observation during the suppression hearing, TFO President's demeanor on the stand was calm and collected, recounting events in an organized and persuasive manner. TFO President remained unfazed even as Defense counsel challenged his version of events. For example, when Defense counsel queried TFO President as to whether he could have possibly observed the eastern side of Defendant's property from his vantage point on the road, TFO President insisted that, although the complete eastern side would not have been visible from the road, parts of it were visible from where he was standing, including the lower northeastern section where he spotted the marijuana plants. *See Murphy*, 402 F. Supp. 2d at 570-71 (finding defendant credible in part because "even upon vigorous and effective cross-examination by the [government], his version of the events of that evening never wavered"). Defendant confirmed that TFO President was accurate in this regard.

Second, TFO President was able to recall the matter at hand in considerable detail, demonstrating a clear and consistent recollection of events. *Cf. United States v. Boyce*, 2015 WL 856943, at *8 (D.V.I. Feb. 26, 2015) (finding "defendant's selective memory and inconsistent testimony on salient points demonstrates his lack of credibility"); *United States v. Jackson*, 560 F. Supp. 2d 331, 336 (D. Del. 2008) (finding the officers' testimonies during the suppression hearing not credible due to inconsistencies).

Third, while TFO President had an interest in the outcome of the proceeding from a professional perspective because of his work on the case, the Defendant—whose liberty may be at stake—has a substantial personal interest in the outcome of this matter. Thus, while both individuals have an interest in the outcome, the Court considers Defendant's personal interest to be greater. Nonetheless, while "[d]efendants in criminal cases always have much riding on the outcome . . . it would be manifestly unfair and highly improper for that overtly or subliminally to

be the determinative factor in judging a defendant's testimony. All of the circumstances must be considered and a credibility determination arrived at based on reason and logic." *Murphy*, 402 F. Supp. 2d at 571. As discussed herein, it is the combination of factors that undergirds the Court's conclusion as to the credibility of TFO President's testimony.

Fourth, other evidence from the hearing supported TFO President's testimony. For example, Defendant admitted that he grew marijuana on his property, corroborating the information provided to TFO President by his Confidential Source. Defendant, who lived on the property for 51 years, further conceded that "everyone would be able to see [marijuana plants] from the dirt road" if they looked to the northeastern side of his property, as TFO President testified that he did on his March 16 visit.

Finally, TFO President's depiction of these events "withstands the common sense test." *Davis*, 2014 WL 1394304 at *3. TFO President received a tip from a Confidential Source reporting marijuana plants growing in the yard surrounding the property. He testified that the Confidential Source also reported that, at different stages of growth, the marijuana plants are moved around the property. Defendant admitted in the hearing that he planted some of his marijuana plants in boxes. Defendant also admitted that he grew marijuana on the eastern side of his property and that he would move marijuana seedlings—which was stored in a different location—to that side of the property. TFO President himself discovered marijuana plants in boxes located in different areas of the property after executing the search. All such evidence renders it believable that the marijuana plants were easily moved around the property. Further, while Defendant argues that, from his vantage point on the dirt road, TFO President could not have confirmed that the plants he saw on March 16 were in fact marijuana without having to move closer to Defendant's property, Defendant testified that he purportedly refrained from using that location for his marijuana

cultivation to avoid precisely what TFO President testified occurred here—viewing of the marijuana plants from the public road. Thus, taken in its totality, the circumstances here as described at the suppression hearing by TFO President are compatible with a "common sense" evaluation of the whole record. *Cf. Davis*, 2014 WL 1394304 at *5 (finding that the detective's testimony was not credible because it failed the common sense test by being inconsistent and not reasonable in the face of the record).

In view of the foregoing, the Court finds TFO President's testimony credible, and thus credits his testimony that he saw marijuana plants growing at the lower northeastern side of Defendant's property from his vantage point on the dirt road on March 16. *See Boyce*, 2015 WL 856943 at *8 ("'At a suppression hearing . . . the Court determines the credibility of witnesses and may accept or reject any or all of a witness' testimony'") (internal citation omitted). [4]

Having determined that TFO President's testimony is credible, we must next consider whether the physical evidence resulting from the search warrant should be suppressed. This determination depends on whether TFO President violated the Defendant's Fourth Amendment rights by committing an illegal entry onto Defendant's property to observe the marijuana plants on his March 16 and 27 visits. As discussed above, the Court credits TFO President's testimony, including his description of the area on the dirt road where his car was located when he viewed Defendant's marijuana plants. Evidence at the hearing confirmed that the dirt road that TFO President used was a public road because it served as the only means of ingress and egress from Defendant's property and that of his neighbors. Moreover, Defense counsel conceded that if the

---

[4] Although the Court acknowledges the candor of Defendant's testimony as it pertains to his admission to growing marijuana on his property and his concession that one would be able to observe marijuana plants growing on the northeastern side of the property from the vantage point where TFO President testified he was located, for the reasons discussed above the Court credits the testimony of TFO President on the disputed issues.

Court credits TFO President's testimony—which it does—the vantage point that TFO President maintained on March 16 could not be construed as a trespass into Defendant's curtilage. Thus, the Court finds that TFO President's observations of the marijuana plants did not violate Defendant's constitutional rights because the observation of illegal activity from a public road with the naked eye, as TFO President testified doing here, is not prohibited by the Fourth Amendment. *See Florida v. Riley*, 488 U.S. 445, 449–50 (1989) ("Thus the police, like the public, would have been free to inspect the backyard garden from the street if their view had been unobstructed").[5] *See also United States v. Lubrin*, 2015 WL 361796, at *5 (D.V.I. Jan. 28, 2015) ("[an officer's] conduct of observing a property's curtilage from the public road does not, alone, implicate the Fourth Amendment"); *United States v. Chun Yen Chiu*, 857 F. Supp. 353, 359 (D.N.J. 1993) ("As a general rule, it is not unlawful for officers outside the curtilage to observe what occurs thereon").

In sum, the Court concludes that there was no illegal entry onto Defendant's property that would warrant the suppression of evidence obtained therefrom.

### B. Probable Cause for the Search Warrant

Under the Fourth Amendment, a search warrant must be supported by probable cause, and "[e]vidence seized pursuant to a search warrant that is not so supported may be suppressed." *United States v. Vosburgh*, 602 F.3d 512, 525 (3d Cir. 2010). Issuing a warrant requires a magistrate judge

---

[5] Even if the Court were to give credence to Defendant's argument that TFO President may have trespassed onto Defendant's property when he turned around to exit the clearing, that area—if not a public thoroughfare—is at most an "open field," beyond the curtilage from which an observation of Defendant's curtilage is also not constitutionally prohibited. *Dunn*, 480 U.S. at 304. Nor are the circumstances here akin to those in *Florida v. Jardines*, where the Supreme Court found that the police officers' use of a drug-sniffing dog on a defendant's front porch to investigate a tip they received about marijuana cultivation in the home constituted an unreasonable search of the defendant's curtilage. 569 U.S. at 8-10. Contrary to Defendant's suggestions, there is no evidence here that TFO President entered the curtilage to gather evidence.

12

to look at "all the circumstances set forth in the affidavit" and "make a practical, common-sense decision" on whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). To uphold an issued warrant, the district court need only be satisfied that "the magistrate had a substantial basis for concluding that probable cause existed. *Vosburgh*, 602 F.3d at 526 (internal quotation marks and alterations omitted) (quoting *Gates*, 462 U.S. at 238-39).

Defendant argues that the probable cause determination for the search warrant was defective since it was dependent on illegally obtained evidence, i.e., TFO President confirmed that the plants were marijuana only because he illegally entered Defendant's property to make his observations. Thus, according to Defendant, any physical evidence from the execution of the search warrant are "fruits of the poisonous tree" and should be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 503 (1963).

Here, the probable cause for the search warrant was based on a tip from a Confidential Source and TFO President's own observations of Defendant's property. As the Court has already determined above, TFO President's observations were not the product of an illegal entry onto Defendant's property. Thus, the evidence upon which the search warrant was based was not illegally obtained, and the premise upon which Defendant challenges the legality of the search warrant fails. *See United States v. Whaley*, 781 F.2d 417, 419 (5th Cir. 1986) ("[T]he mere observation of [marijuana plants] from the road or driveway would not justify entry into the home or curtilage to search and seize property found there . . . [but] [t]hat would have given probable cause to support a warrant").

## CONCLUSION

Based on the foregoing, the Court finds that there was no illegal entry onto Defendant's property in violation of his Fourth Amendment rights and therefore the physical evidence resulting from the subsequent search executed upon his property will not be suppressed. Accordingly, the Court will deny Defendant's "Motion to Suppress Physical Evidence and Statements."

An appropriate Order accompanies this Memorandum Opinion.

Date: February 14, 2018                    _____/s/_____
                                           WILMA A. LEWIS
                                           Chief Judge